Michelle R Burrows OSB 861606
LAW OFFICE MICHELLE R. BURROWS P.C.
16869 SW 65th Ave # 367
Lake Oswego, OR 97035
503-241-1955
Michelle.r.burrows@gmail.com
www.oregoncivilrights.com


Attorney for Plaintiff


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division


| | |
|---|---|
| BRIAN THORNTON,<br><br>                                    Plaintiff<br><br>v.<br><br>MATT SMART, TOM BECK, JON ZWEMKE, JAMES HIXENBAUGH, and CITY OF REEDSPORT, a municipal subdivision of the State of Oregon<br><br>                                    Defendants. | No.<br><br>COMPLAINT<br>Civil Rights Violations: Excessive Force, False Arrest, Malicious Prosecution, Assault<br><br>42 USC § 1983<br><br>JURY TRIAL DEMANDED |


**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, by and through his lawyer, Michelle R. Burrows, brings his complaint herein

alleging as follows:

**INTRODUCTORY STATEMENT**

1.

This action is filed by Plaintiffs under 42 U.S.C. § 1983 and ORS 30.265, for events

occurring on or about October 18, 2019, alleging unreasonable use of force, in violation of the

1 - COMPLAINT

Fourth Amendment to the United States Constitution, along with state torts of assault arising

from the wrongful, unreasonable and unnecessary arrest, choking, beating and assault on

Plaintiff.

2.

This court has jurisdiction over Plaintiff's claims of violations of federal Constitutional

Rights under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343.

3.

Venue is proper under 28 U.S.C. § 1391(b), in that one or more of the defendants reside

in the District of Oregon and Plaintiff's claims for relief arose in this district.

4.

The court has supplemental jurisdiction over Plaintiff's pendent state law claims under 28

U.S.C. § 1367.

5.

Plaintiff is entitled to a reasonable attorney fee pursuant to 42 U.S.C. 1988.

## **PARTIES**

6.

Plaintiff Brian Thornton was at all times an individual residing in Douglas County,

Oregon.

7.

Defendant Matt Smart was at all times an individual residing in Reedsport, Oregon and at

all times was the Chief of Police. At all times he was acting under color of law.

//

//

8.

Defendant Tom Beck was at all times an individual residing in Reedsport, Oregon and at all times was a certified police officer. At all times herein he was acting under color of law.

9.

Defendant Jon Zwemke was at all times an individual residing in Reedsport, Oregon and at all times was the Superintendent of the Reedsport School District 105.

10.

Defendant James Hixenbaugh was at all times an individual residing in Reedsport, Oregon and was during the alleged times the Athletic Director for Reedsport High School.

11.

Defendant City of Reedsport is a municipal subdivision in the State of Oregon in Douglas County.

**FACTUAL ALLEGATIONS**

**Football Game**

12.

On October 18, 2019, Reedsport High School and Gold Beach High School met to play football. The game was very lopsided with Reedsport ultimately winning 45-16. The Gold Beach fans became angry and belligerent calling the Reedsport parents "trash." Videos of the game recorded many adults yelling expletives at the referees, the players and the other parents in the stands. Some Gold Beach fans threatened to "kick the ass" of the Reedsport fans.

//

//

//

3 - COMPLAINT

13.

Defendants Smart and Beck were attending the game staffing the hamburger shack. They wore red aprons proclaiming "Protect and Serve" and each wore a Reedsport Police Department sports cap.



14.

Mr. Thornton was standing on a raised area of the baseball field adjacent to the football field watching his son, Tyler, play football. This mound has a good vantage point to watch the game and generally there are 3-7 people standing there at each game. This night Mr. Thornton and his friend, Kevin Manicke, stood on the mound watching the game.



Picture of field[1]

---

[1] Green bubble is the building where Mr. Thornton was standing. More specifically, he stood in the yellow area at the upper right-hand corner of the building. The blue dot on the field nearest the small building is where the team stood. At the left edge of the field, in the end zone, is a second yellow indicator which is where the altercation occurred with Mr. Walker.

5 - COMPLAINT

15.

As the game progressed, Gold Beach players became increasingly frustrated and started playing more aggressively incurring a significant number of penalties. Many of the Reedsport players were young men Mr. Thornton had coached for nearly ten years starting in grade school. In the fourth quarter, one of the Reedsport players incurred a 15-yard penalty and became upset. Mr. Thornton was near the goal line and called out to the Reedsport player to pick up his head and go forward. It was part of a common statement he regularly made to his players.

16.

Landon Timeus, a Gold Beach player, said some man standing near the sidelines was "trash talking" to the players. Mr. Timeus identified this man as Kevin Manicke. Mr. Timeus claims the Gold Beach players asked Mr. Manicke to stop. Mr. Timeus identified Mr. Manicke by pointing him out in the crowd during a police interview.

17.

Officer Gardner learned from Defendant Smart that someone "choked out a child." There was no clear identification of either the child or the adult. Officer Gardner once again interviewed Mr. Timeus who said the adult only grabbed him by the shoulder pads and never choked him. Mr. Timeus then changed his story about which adult assaulted him, now identifying Mr. Thornton as the perpetrator. Mr. Timeus' mother, Amy Timeus, was involved in the interview of her son and insisted Mr. Thornton had crossed onto the field and choked her son. She demanded Mr. Thornton be arrested. Landon Timeus did not support most of what Amy Timeus told officers.

//

//

6 - COMPLAINT

18.

Defendant Hixenbaugh told police that Mr. Thornton was "running his mouth" about a penalty against Reedsport. Defendant Hixenbaugh said Mr. Thornton and the Gold Beach coach began to curse at each other. Defendant Hixenbaugh said that was when he first approached Mr. Thornton. Defendant Hixenbaugh says the Gold Beach coach, Mr. Clark, told Mr. Thornton he would "come over there and kick your ass." Defendant Hixenbaugh alleges that Mr. Thornton then passed under the chains around the field and walked towards Mr. Clark. According to Defendant Hixenbaugh, at that point the Gold Beach players "swarmed around" and then Mr. Thornton grabbed one of the Gold Beach players by the throat. Defendant Hixenbaugh claims Gold Beach player #14 was grabbed by the throat. Officer Gardner found that there is no #14 player with Gold Beach and that Landen Timeus is #11. Defendant Hixenbaugh told Smart that Mr. Thornton had "grabbed a Gold Beach player by the throat."

19.

Defendant Hixenbaugh told officers at the point of the "swarming" he kicked Mr. Thornton from the game. Mr. Thornton began moving toward the north entrance to the field. Defendant Hixenbaugh said some other guy walking in the opposite direction from Mr. Thornton said something to Mr. Thornton and Mr. Thornton called him a "fucking tweaker." The man, who was identified as Richard Walker, started towards Mr. Thornton and according to Defendant Hixenbaugh, that was when Defendant Smart joined the gathering. Defendant Hixenbaugh claims they saw Walker and Mr. Thornton "square up" with each other and at that time Walker punched Mr. Thornton in the face.

//

//

7 - COMPLAINT

20.

Most of what Defendant Hixenbaugh told police was not true. There are two videos of the events which contradict most of what Defendant Hixenbaugh told police. A video of the first part of the altercation taken by the Gold Beach football team showed Mr. Thornton on the wrong side of the divider chains but that Mr. Thornton was backing up and Mr. Manicke pulled the chain over Mr. Thornton so they were both on the correct side of the chains. The video shows Gold Beach assistant coach, Christopher Clark, "in an absolute uncontrolled rage."[2] The video had sound. Mr. Thornton is calm and collected, "running his mouth" but "calm."[3] Mr. Clark on the other hand "is shouting obscenities."[4] Mr. Clark goes after Mr. Thornton but is restrained by the "swarm" of his own players holding him back. Mr. Clark walks to the small building in the map at paragraph 14 and punches the side of the building "in rage."[5]

21.

At no time in the video is Mr. Thornton seen touching any Gold Beach player; however, Gold Beach players are coming at Mr. Thornton and reaching for him. Mr. Thornton never touches any of them. Landen Timeus is in the video but at no time is even remotely close enough for Mr. Thornton or Mr. Manicke to touch, grab or choke him. Mr. Timeus is never in close proximity to Mr. Thornton but is seen moving his own teammates toward the coach and sidelines. Mr. Timeus wrote a letter to Defendant Smart once again changing his story. He now claims Mr. Thornton grabbed his pads, tried to rip off his helmet and his facemask was up around his eyes and screaming at Timeus "You wanna go #11?" He claims he was "literally

---

[2] Report by Officer Gardner
[3] Id
[4] Id
[5] Witness not interviewed by police

scared for his life." This is a sharp contrast with all his previous versions and is not verified by the video.

22.

After Defendant Hixenbaugh asked Mr. Thornton to leave the game, Mr. Thornton walked away from along the track that ran around the football field. He moved past the goal posts and was nearing the exit gate when Richard Walker came towards him. This is reflected in the second video. Mr. Thornton did not address Mr. Walker, but Mr. Walker simply walked up and hit Mr. Thornton. Mr. Walker changed his story multiple times in police interviews.

23.

Two of Mr. Thornton's former players were walking toward him when they saw Mr. Walker approaching Mr. Thornton, muttering a number of expletives and yelling at Mr. Thornton. Mr. Thornton did not know Mr. Walker. Mr. Walker ran up to Mr. Thornton and hit him in the face without warning or provocation while saying "I'm going to kick your ass. I was in MMA for 13 years".  This is recorded on several videos taken at the game. Defendant Smart refused to review the cell phone video of this contact.

24.

In response to being struck, Mr. Thornton can be seen in videos shoving Mr. Walker away. Mr. Walker then kicked Mr. Thornton. Mr. Thornton grabbed Mr. Walker to stop him; the two tussled and then slipped on the wet grass. They both went down to the ground with Mr. Walker on top. Several individuals, including the defendants, ran up to the two men. Defendant Beck can be seen entering the scene wearing his red apron, removing Mr. Walker and taking him aside. Defendant Beck did not manage the growing angry crowd, nor did he try to extract other individuals who were now piling on top of Mr. Thornton.

25.

Defendant Smart entered the scene after Mr. Walker was removed but during a time Mr. Thornton was flat on the ground and covered by at least two other adult males. Defendant Smart claims he yelled "Police Stop" "multiple times" as he ran from somewhere on the field toward the altercation near the exit gate. Defendant Smart claims Mr. Thornton and Mr. Walker faced each other with closed fists "into a fighting stance". Defendant Smart claims Mr. Walker hit Mr. Thornton several times in the face. The video contradicts much of Defendant Smart's description.

26.

Defendant Smart claims he identified himself as "Reedsport Police Stop Fighting". The crowd was rather substantial at that point. No one heard Defendant Smart make any statements before he grabbed Mr. Thornton by the arm from the bottom of the pile, lifted him bodily and slammed him headfirst into the ground. Defendant Smart didn't identify himself to Mr. Thornton nor give any verbal orders to Mr. Thornton.

27.

Defendant Smart claims the effort of lifting Mr. Thornton caused his knee to hit the ground "sending radiating pain into my hip and back". He claims he thought Mr. Thornton *might* get up and continue fighting so he had to take him out quickly. He also claims he did not have the ability to control the crowd or Mr. Thornton as Defendant Beck was busy elsewhere. Smart claims he told Thornton he was under arrest. Witnesses deny this. Smart admits he put his arm around Mr. Thornton's throat in a Carotid Restraint hold. However, he did not use a Carotid hold, but rather he utilized a chokehold while pulling Mr. Thornton backwards to stop oxygen to

the brain. Defendant Smart claims Mr. Thornton "continued to struggle" as the chokehold was placed.

28.

Defendant Smart's report on the incident is quite artistic. Defendant Smart claims "not only did Mr. Thornton not stop struggling he started to lift himself and me up off the ground. I knew he was angry and had just grabbed a youth from the opposing team in anger and was now fighting with an adult. I was not about to allow him to continue with his rampage which was quickly turning into the closest thing to a riot as it gets". Defendant Smart had received information about the choking from Defendant Hixenbaugh which was false, had intentionally misstated the facts of the attack by Mr. Walker and ignored the information he was getting from the crowd around him who were screaming to stop choking Mr. Thornton.

29.

Defendant Smart claims he told Mr. Thornton if Mr. Thornton did not "stop trying to get free of my hold *I would choke him out*". Defendant Smart claims he repeated Mr. Thornton was under arrest and to stop. Witnesses deny this occurred. Defendant Smart claims Mr. Thornton did not stop and "I used the Carotid Restraint to gain compliance." Defendant Smart claims he "monitored Thornton as I applied the restraint. As Thornton relaxed his muscles, I too relaxed my hold on him and could feel and see the rise and fall of his breathing. I know he was done because he verbally acknowledged me by saying 'I'm done.'"

30.

Mr. Thornton was incapacitated immediately when his head rammed into the ground and was physically incapable of engaging in any physical action. Defendant Smart later told witnesses "I knew I couldn't take Thornton so I had to take him out fast." Defendant Smart also

told others that Mr. Thornton was "coming at him," which is not reflected in the video or bystander statements. Mr. Thornton was immediately knocked unconscious and suffered a significant traumatic brain injury. Mr. Thornton has suffered three previous brain injuries from playing football and is at high risk for permanent brain injury and Concussive Disorder.

31.

Mr. Thornton has no independent recall of the events before he was placed in the patrol car after the altercation. Witnesses to Defendant Smart's action included several bystanders and fans, all four of Mr. Thornton's minor children, Mr. Thornton's wife, Stacey, her sister, and several of Mr. Thornton's former players and friends he was standing with watching the game. Defendant Smart took charge and ordered Mr. Thornton's friend, Kevin Manicke, to hold Mr. Thornton's arms behind his back. Mr. Manicke reported Mr. Thornton was limp and possibly unconscious. He communicated that to Defendant Smart. Defendant Smart ordered Defendant Zwemke to hold Mr. Thornton's leg. Defendant Zwemke did so even though he was not a police officer, not trained in restraint holds, and was the Superintendent of Schools. Defendant Smart did not ask Defendant Beck to do anything to control the crowd, to move the crowd back, to restrain Mr. Thornton or generally to do anything normally associated with police action at a potential crime scene.

32.

While Mr. Thornton was on his stomach, unconscious, Defendant Smart leaned the full weight of his body across Mr. Thornton's back, wrapping his forearm across Mr. Thornton's throat and pulled Mr. Thornton up by the throat so that his back was arched backwards toward his hips. Mr. Thornton's children and wife were standing next to Mr. Thornton's head screaming at Defendant Smart to stop, that Mr. Thornton could not breathe and was turning purple. Other

people in the crowd were also screaming at Defendant Smart to release Mr. Thornton because it

appeared Defendant Smart was trying to kill Mr. Thornton.

33.

Mr. Thornton's face turned purple, he was gurgling, lost control of urine, was not moving

and his eyes rolled back in his head. Stacey Thornton told Defendant Smart this while he

continued to apply the illegal chokehold. Thornton's son, Tyler, was across the field, ran nearly

the 100 yards to the location, and removed his helmet during the time Defendant Smart held the

chokehold. Defendant Beck did not try to stop Defendant Smart from using the chokehold.

Defendants Zwemke and Hixenbaugh did not try to stop Defendant Smart.

34.

Mr. Thornton's children were crying and screaming at Defendant Smart to stop choking

Mr. Thornton. Defendant Smart leisurely told Stacey to move back or he would arrest her. He

told her Mr. Thornton was resisting all while the crowd yelled at him Mr. Thornton was

unconscious and getting worse. Defendant Smart told Stacey he would "loosen" the hold if she

would step back. This is in violation of virtually every Constitutional restraint on police use of

force. Stacey Thornton moved back and Defendant Smart loosened the hold. Mr. Thornton had

stopped breathing before that and upon the loosening of the chokehold Mr. Thornton began

breathing again.

35.

Defendant Smart pulled Mr. Thornton up and placed him in a patrol car. No one took Mr.

Thornton to the hospital but allowed Mr. Thornton who was groggy to be handcuffed to a bench

in the police station. During the drive to the station, Officer Wood read Mr. Thornton his

protected 5th Amendment rights. Mr. Thornton invoked and asked for an attorney. Despite the

request for an attorney, Officer Wood continued to seek information from Mr. Thornton. During

the three hours Mr. Thornton was handcuffed in the station, his wife, brother-in-law and sister-

in-law were in the waiting room recording the statements given to them by the police. They

posted bail but Defendant Smart refused it. At no time did Defendant Smart or his officers have

Mr. Thornton examined by a doctor.

36.

After Mr. Thornton requested an attorney, he was told he was being "uncooperative".

Officer Wood then requested a Breathalyzer test from Mr. Thornton who had not been driving at

anytime during the events noted above. Mr. Thornton repeated he wanted a lawyer and refused

the Breathalyzer. Defendant Smart arbitrarily assigned several potential crimes to Mr.

Thornton's conduct telling witnesses "I'm going to charge him with disorderly conduct and

harassment and anything else I can think of when we get down there". Defendant Smart told

another officer "I'm going after Thornton."

37.

At the game, Defendant Smart was approached by a woman who was a Gold Beach fan.

She told Defendant Smart "You have the wrong guy" and pointed to the correct man who started

the altercation with Gold Beach; the same one originally identified by Timeaus. Defendant Smart

told the woman she was wrong and she should leave. No one took her statement. Defendant

Smart left the football game and put on his uniform. He drove his cruiser and stopped Mr.

Thornton's brother-in-law, Brett Fitzgerald, who was driving home. Defendant Smart used the

overhead lights on his cruiser, pulled Mr. Fitzgerald over and started to ask him questions about

Mr. Thornton and tried to justify all the physical actions he took against Mr. Thornton.

Defendant Smart also accused Mr. Fitzgerald of intending to drive to Defendant Smart's house to

seek some type of "revenge" on Defendant Smart over the actions toward Mr. Thornton. Mr. Fitzgerald was driving home. Defendant Smart let him go.

38.

The day after the incident, Mr. Thornton went to the ER. He had a CT scan of his throat. His esophagus was badly swollen, making it difficult to swallow. His face was covered with petechiae[6] caused by bleeding under the skin. He suffered subconjunctival hemorrhages[7] (bleeding) from trauma to the eye. He has a total blackout in memory of the events of the assault and choking, suffers from some vertigo, and post traumatic systems. He is being presently evaluated for an exacerbation of his underlying brain trauma.

39.

Defendant Tom Beck, who is now a sergeant with the Reedsport Police Department, took Walker who assaulted Mr. Thornton aside and held him calmly. Defendant Beck observed Defendant Smart use the illegal and unauthorized choke hold but took no actions to intervene or stop Defendant Smart. While Defendant Smart was sitting on Mr. Thornton's back, Defendant Zwemke sat on Mr. Thornton's legs completely incapacitating Mr. Thornton so he could not defend himself. If the crowd had not called off Defendant Smart, it is highly likely Defendants Smart and Zwemke could have caused serious physical injury or death to Mr. Thornton.

**Criminal Charges**

40.

Mr. Thornton was charged originally with Disorderly Conduct, Harassment, and Criminal Trespass even though no officer saw any of the actions, did not appear to take the statements of

---

[6] Tiny purple, red, or brown spots on the skin caused by broken blood vessels.
[7] A subconjunctival hemorrhage happens when blood appears in the clear skin part of the eye (the conjunctiva) that covers the white part (the sclera).

witnesses providing exculpatory evidence, and refused to review the cell phone video of the altercation. The District Attorney dismissed those charges. Defendant Smart was not satisfied with that and contacted County attorneys to charge Mr. Thornton in municipal court with violations.

### Intimidation and Harassment

41.

Various witnesses report Defendant Smart took an active role in manipulating the charges in order to "go after Thornton". They said he contacted and harassed witnesses and was an integral part of removing Mr. Thornton from all school property in Reedsport. Defendant Smart both personally and through orders to other officers took the following actions to suborn perjury, intimidate witnesses and violate Brady requirements imposed on police as part of a criminal investigation.

1. Officers Wood and Gardner were sent to enter the high school through the back door to avoid detection and interview Tami McGill, a cook at the school. Ms. McGill gave a statement contradicting Defendant Smart's version of the altercation. The officers were in uniform and forced Ms. McGill to leave her assigned workspace, telling her she needed to make sure her story was "correct." Ms. McGill recorded the interview.

2. Officers Wood and Gardner were sent into the high school, ordered minors from their class and confronted them in the same way. The officers tried to interview Dallas McGill and Connor MacGregor. The officers did not have permission to pull the students from their classes, had not called their parents first and did not have consent from any adult to interview the students. The officers did not call any of these

witnesses first to set up appointments. These witnesses also provided statements contradicting Defendant Smart.

3.   Defendant Smart and his officers started pulling over other witnesses who did not support Defendant Smart's version, tried to interview the drivers, and told them to make sure they had their stories correct.

4.   Defendant Smart started going to Coos Bay to walk by Stacey Thornton's place of business and simply stared into the window. This was witnessed by customers and Ms. Thornton herself.

5.   Defendant Smart also requested Defendant Hixenbaugh get Mr. Thornton "trespassed" from school property and then wrote a complaint to the local OSAA to get Mr. Thornton "trespassed" from several other schools for one year. Defendant Hixenbaugh took this action at Defendant Smart's direction even though much of what was in his complaint was inaccurate or outright false.

6.   It is believed on witness statements Defendant Smart used Defendant Hixenbaugh and others to harass the Thornton children who ranged in age from 9 to 17 years old at the time.

7.   Smart ordered that only a limited number of witnesses be interviewed. The witnesses interviewed and listed in the police reports include mostly Gold Beach players. The witnesses favoring Mr. Thornton were bullied, intimidated, followed and coerced.

42.

The aggressor in the assault on Mr. Thornton, Mr. Walker, was never charged with anything and was released from custody the same night. Mr. Walker ran up to Mr. Thornton from a far distance, struck Mr. Thornton for no reason and started the fight on the field. It is

unknown why the initiator of the conflict was never charged with a crime and never suffered any legal consequences.

**Defendant Matt Smart**

43.

Matt Smart became the Chief of Police in Reedsport on August 16, 2019, after being promoted from Corporal to Chief. He has held the rank of police officer, Corporal and Chief. He began at Reedsport PD on November 22, 1999 after moving from out-of-state. According to DPSST, Defendant Smart has no college degree. He had updates on the Use of Force policies training pertinent to the State of Oregon in January 2021 and September 2020 but nothing appears to be recorded for 2019.

44.

In May 2020, Matt Smart together with Gary Klopfenstein, Chief of Roseburg Police, Brandon Sarti, Chief of Winston Police, and Jonathan Brewster, Chief of Myrtle Creek Police, issued a joint statement denouncing the actions of Derek Chauvain by kneeling on the back of George Floyd. The statement issued by the Chiefs includes:

> We stand together, as a unified body of local law enforcement leaders in Douglas County, to denounce the actions and improper tactics utilized in Minneapolis, Minnesota. As criminal justice officers we, and those in our employ, are charged to serve humankind and to provide for the security of our communities. We take seriously the oaths we swore and the ethics that guide or profession. The incident in Minneapolis is not reflective of the values we regard and seek to uphold in our respective jurisdictions. It is our resolve to continued serving our communities with a strong ethical and moral compass while earning your trust and respect on a daily basis.[8]

//

//

//

---

[8] "Local law enforcement officials denounce tactics of former Minneapolis police officer", The News-Review (May 31, 2020)

18 - COMPLAINT

**Use of Force**

45.

Law enforcement may use the amount of force necessary to perform the tasks in front of them. They can only use the amount of force objectively reasonably necessary. Oregon uses the standard for police force based on the holding in *Graham v. Connor*. In order to use deadly force, law enforcement must have an objectively reasonable belief deadly force is needed because they or others are *in imminent and serious risk of death or seriously bodily injury.*

46.

Carotid holds and "chokeholds" are considered use of deadly force and have been banned in most states including Oregon. The use of chokeholds is the focus of a federal bill to ban them completely. Chokeholds involve placing pressure on the front of the neck which decreases or stops the person's ability to take in oxygen. In addition to a serious risk of causing death, these holds can also cause damage to the hyoid bone in the front of the throat. Carotid holds do not cut off oxygen but put pressure on the carotid arteries to diminish blood flow to the brain and where properly deployed will render a subject unconscious in 4-7 seconds. Using either hold on a subject in a prone position on his stomach is similar to the situation causing the death of George Floyd. These neck restraints are banned in many police jurisdictions.

47.

Law enforcement personnel commonly use the term "choke you out" to mean the chokehold and its use has led to numerous in-custody deaths. A law enforcement officer may not use force as punishment or as a pain compliance tool but only enough to stop a threat and to arrest a suspect. Defendant Smart admitted he was choking out Mr. Thornton to gain compliance with commands. Law enforcement may not use force proactively for what they "think" a suspect

19 - COMPLAINT

will do. Mr. Thornton was unconscious and had lost much of his bodily functions and was not fighting nor resisting.

48.

In 2020, Governor Brown signed HB 4301 banning the use of chokehold containment strategies by police. The bill also clarifies that a peace officer may use deadly physical force upon another person only when it is objectively reasonable including against violent felony suspects, in defense of another officer or member of the public, to cease the attempted escape of violent felony and only if all other avenues have been exhausted or decided to be ineffective.

**FIRST CLAIM FOR RELIEF**: Unreasonable Use of Force
Defendants Smart, Beck, and Zwemke

49.

Mr. Thornton realleges all previous paragraphs as if more fully set forth.

50.

Mr. Thornton was entitled to be free from unlawful seizure of his person pursuant to the parameters of the 4th Amendment to the United States Constitution. Mr. Thornton was also entitled to be safe and secure from undue and unreasonable force including deadly force. Deadly force is the force which can cause death or serious physical injury and may only be used by law enforcement when they personally, or someone else, are facing serious imminent danger of death or serious physical injury. Chokeholds are deadly force pursuant to numerous federal appellate decisions.

51.

Defendants used deadly force to make a suspect hold still and under the unconstitutional belief such deadly force was necessary to prevent future "resistance". The acts and omissions of Defendants in using extreme and unreasonable force in sitting on, choking and seriously injuring

Mr. Thornton without a reasonable belief that Mr. Thornton presented an imminent and serious danger to themselves or others is a violation of the 4th Amendment restriction on deadly force. Mr. Thornton was fully subdued, unconscious, held down by several individuals and had not even been the instigator of the fight nor the confrontation with the Gold Beach coach.

52.

The officers failed to ascertain all reasonable and objective facts and used personal animus rather than probable cause to assault Mr. Thornton. They also failed to de-escalate and failed to follow proper procedures on arrest and use of force policies. Defendant Beck failed to stop Defendant Smart when Smart used the illegal and highly dangerous choke hold, nearly killing Mr. Thornton. His failure to act is a violation of the Constitutional mandates against unreasonable force.

53.

Defendants' conduct was well-defined by law and each Defendant knew or should have known that their conduct was not only well below the standard prescribed by law, but illegal *per se*.

54.

As a result of these Constitutional violations, Mr. Thornton suffered and endured conscious pain, and thereafter faced serious injuries, lost consciousness, and now suffers from severe psychological and emotional losses including memory, cognition and ongoing nightmares and flashbacks. All these injuries arise from the unconstitutional actions by defendants herein. Mr. Thornton will be seeking a judgment for the economic and non-economic damages in an amount to be determined at trial.

//

**SECOND CLAIM FOR RELIEF:** Due Process Violation
Loss of Liberty 14th Amendment
Defendants Smart and Hixenbaugh

55.

All previous allegations are incorporated herein as if more fully set forth.

56.

Mr. Thornton is protected under the substantive due process clause of the 14th

Amendment from government action which impose on his liberty interests. Reputation and

freedom are liberty interests. Association with others is a liberty interest.

57.

Defendant Smart engaged in conduct which shocks the conscience when he manipulated

information, provided false reports, continued to harass and intimidate witnesses, and provided

suspect information to the OSAA and School Board as a way to silence and punish Mr.

Thornton. Defendant Smart used his position as Chief of Police at all times and was deliberately

indifferent to the rights held by Mr. Thornton.

58.

Defendant Hixenbaugh engaged in conduct which shocks the conscience when he

provided false information to Defendants Smart and Beck that Mr. Thornton had choked a player

thus starting the entire chain of events. Defendant Hixenbaugh compounded his actions when he

gave interviews elaborating on his factual misstatements. Defendant Hixenbaugh has a long and

troubled history with Reedsport and Mr. Thornton who was a School Board member who found

evidence of sexual misconduct by Defendant Hixenbaugh with minors he was coaching.

Defendant Hixenbaugh lost his position as a result of the investigation which was conducted by

Mr. Thornton.

22 - COMPLAINT

59.

As a result of the conduct by Defendants Smart and Hixenbaugh, Mr. Thornton lost access to the events he loved and activities he enjoyed including many once-in-a-lifetime moments of his son who was a senior at Reedsport High School. Mr. Thornton suffered serious loss of reputation in his community. All of the damages incurred shall be more fully proven at trial including economic and non-economic losses associated with this conduct.

**THIRD CLAIM FOR RELIEF**: Monell
City of Reedsport

60.

Mr. Thornton realleges all previous paragraphs as if more fully set forth herein.

61.

Defendant Smart is a policymaker and thus his decisions and actions can create policy to impose municipal liability on the City of Reedsport.

62.

A municipality is a "person" for purposes of 42 USC § 1983 and can be held liable for Constitutional deprivations that are caused by a formal or informal policy, custom or practice which was a significant factor in the Constitutional loss suffered by Mr. Thornton. A "policymaker" can create policy through formal or informal actions or decisions.

63.

The actions of the policymaker created the following formal/informal policy, custom or practice which was a motivating cause of the Constitutional deprivations suffered by Mr. Thornton:

1. A policy allowing for the use of chokeholds to subdue suspects, even those who are not resisting and those who are unconscious;

23 - COMPLAINT

2. A policy allowing for the use of chokeholds to gain compliance by suspects to commands;

3. A policy allowing for made-up charges without probable cause in order to impose control over a potential suspect;

4. A policy which permits investigation to reach a desired outcome rather than reviewing the objective and fair evidence;

5. A policy which refuses to collect, review and disseminate exculpatory evidence, allows for the intimidation of witnesses to include breaking legal constraints on contacting minors, trespassing on property to conduct interviews, and threatening and intimidating witnesses with a view different form the "desired outcome";

6. A policy of using the power of law to use citizens to effectuate punishment beyond that allowed and which is based on false and manipulated evidence; and

7. A policy of using the power of the police to ignore existing standards on arrest, use of force and investigations.

64.

As a result of the informal policies, formal policies, customs and practices of the City of Reedsport caused by the unchecked power of the Chief of Police, Mr. Thornton's protected 4th, 5th, 6th and 14th Amendment rights were violated and led to his arrest, as well as his being a victim of unauthorized deadly force, being presented with charges not based on probable cause, and being the victim of a shoddy, corrupt investigation to include witness intimidation, suborning perjury and failure to provide and protect Brady material as part of a criminal investigation.

//

24 - COMPLAINT

65.

As a result of the violation of his protected Constitutional rights arising from the policies, customs and practice of the City of Reedsport, Mr. Thornton suffered extensive physical, emotional and financial injuries which will be more fully proven at trial.

**FOURTH CLAIM FOR RELIEF**: Battery
City of Reedsport

66.

Mr. Thornton realleges all previous paragraphs as if more fully incorporated here.

67.

The City of Reedsport is responsible for the torts committed by their employees in the course of their duties.

68.

The following actions constitute forcible, unwanted physical contact and injury against Mr. Thornton without cause or legal justification:

1.  Defendant Smart, without any objectively reasonable facts or probable cause, slammed Mr. Thornton headfirst into the ground simply to subdue him when Mr. Thornton was pinned to the ground and not under arrest;

2.  Defendant Smart, without any objectively reasonable basis to believe he or anyone else was in imminent threat of serious physical injury or death, used an unlawful form of deadly force against an unconscious man;

3.  Defendant Smart, without any objectively reasonable basis, choked Mr. Thornton nearly to death causing the blood vessels in his eyes and face to burst, caused Mr. Thornton to lose control of his urine, told bystanders Mr. Thornton was "resisting", and bargained with Mr. Thornton's wife all while choking Mr. Thornton nearly to death. Defendant

Smart had a duty to stop the use of force when Mr. Thornton was subdued. Mr. Thornton was unconscious when Defendant Smart started the illegal chokehold.

4. Defendant Smart and Zwemke used unlawful physical contact and force to render Mr. Thornton incapacitated while they tried to choke Mr. Thornton to death.

69.

As a result of the unlawful, unwanted and serious physical battery against Mr. Thornton, he suffered a damaged esophagus and broken blood vessels in his face and eyes. He also lost consciousness and suffered an exacerbation of his brain trauma. Mr. Thornton suffered serious emotional damages, anxiety, depression and is still subject to regular intimidation by law enforcement. Mr. Thornton lost the ability to see his son play football and attend other school events during his son's senior year based on the baseless ban caused by Defendants Smart and Hixenbaugh. All the economic and non-economic damages will be more fully proven at trial.

WHEREFORE Mr. Thornton prays for judgment:

1. A judgment against Defendants for violation of the 4th and 14th Amendment rights which protect him for an amount to be determined at trial.

2. A verdict against the City of Reedsport for permitting the Chief of Police to engage in a pattern and practice of illegal and unconstitutional acts and commit battery out of personal animus in an amount to be proven at trial.

3. A judgment for Mr. Thornton's attorney fees and costs.

4. Such other relief as is supported by the law.

//

//

//

26 - COMPLAINT

Dated this 15th day of October 2021.

Respectfully submitted,


/s/Michelle R. Burrows
Michelle R. Burrows OSB 861606
Attorney for Plaintiff

27 - COMPLAINT